**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Janelle Sargent

     v.                                         Civil No. 14-cv-509-AJ
                                               Opinion No. 2017 DNH 210
Town of Hudson, et al.


**MEMORANDUM AND ORDER**

Janelle Sargent alleges that her former employer, the Town of Hudson Police Department ("HPD"), treated her reports of domestic violence differently than those made by other women solely because her abuser was a police officer in a neighboring town.  She initially brought this action in state court, alleging two counts: (1) a state-law gross negligence claim brought against the Town of Hudson ("Town") and three HPD officers[1] under New Hampshire Revised Statutes Annotated ("RSA") § 173-B:12 (Count I); and (2) a federal claim alleging an equal-protection violation on a "class-of-one" theory, brought against the three officers (the "individual defendants") under 42 U.S.C. § 1983 (Count II).  Defendants removed the action to this court on the basis of the federal claim, and the parties consented to the jurisdiction of the undersigned magistrate judge.

---

[1] Chief Jason Lavoie, Captain William Avery, and Lieutenant Charles Dyac.

Defendants move for summary judgment on both counts. Doc. no. 17. Plaintiff opposes summary judgment (doc. no. 33), but also asks that this court certify two questions to the New Hampshire Supreme Court with respect to her state-law claim (doc. no. 24). Defendants object to certification (doc. no. 25) and move to strike certain exhibits attached to plaintiff's objection to summary judgment (doc. no. 38).

For the reasons that follow, the court **grants** defendants' motion for summary judgment as to the federal claim, finding that the individual defendants are entitled to qualified immunity. The court declines supplemental jurisdiction over the state claim and **remands** the case to the superior court, concluding that it is the appropriate forum to resolve this claim in the first instance. The court therefore **denies** plaintiff's motion to certify. In light of these determinations, the court **denies as moot** the motion to strike.

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If a nonmovant bears the ultimate burden of proof on a given issue, she must present 'definite,

competent evidence' sufficient to establish the elements of her claim in order to survive a motion for summary judgment." Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  The court must "draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, or unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).  Where, as here, the moving party raises a qualified immunity defense, the nonmoving party has the burden of showing that qualified immunity does not apply.  See Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015) (second prong); cf. Lopera v. Town Of Coventry, 640 F.3d 388, 395-96 (1st Cir. 2011) (first prong); Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

## II.  BACKGROUND

Unless otherwise noted, the following facts are undisputed in the record.  Janelle Sargent began working for the HPD as a fulltime dispatcher in July 2005.  Doc. no. 33-3 ¶ 4.  Janelle

married her ex-husband, Benjamin Sargent,[2] two months later.  Id.
¶ 3.  Beginning in 2009 or 2010, Janelle was transitioned to the
HPD legal department due to a backlog, though she continued to
spend time working in dispatch.  Doc. no. 17-4 at 2-3; doc. no.
33-7 at 19 (mentioning that Janelle worked in dispatch in 2011).
Janelle was a good employee, with HPD Captain William Avery
describing her as "probably the best dispatcher [he] ever worked
with."  Doc. no. 17-4 at 2-3.

In 2011, Ben was hired by the Litchfield Police Department
("LPD").  Doc. no. 33-3 ¶ 5.  The individual defendants all knew
that Ben worked for the LPD during the period relevant to this
case.  See doc. no. 33-4 at 8; doc. no. 33-5 at 23; doc. no. 33-
12 at 16.  It does not, however, appear that any individual
defendant interacted with Ben more than in passing during this
timeframe.  See doc. no. 33-4 at 8; doc. no. 33-5 at 23.

## A.    Early Instances of Domestic Violence

At some point in 2011, Janelle told HPD Officer Kevin
Sullivan that Ben had pointed a gun at her head while she was
taking a shower.  Doc. no. 33-7 at 19-20.  Janelle did not ask
Sullivan to initiate a criminal complaint or investigation
because she was scared for her life.  Id. at 21.  There is no

---

[2] Because Janelle Sargent and Benjamin Sargent shared a last
name during the period relevant to this case, the court will use
their first names in this order so as to avoid confusion.

evidence in the record suggesting that Janelle or Sullivan ever
formally reported or otherwise mentioned this incident to anyone
else at the HPD.

In early April 2012, Ben assaulted Janelle, causing
bruising to her temple and her neck.  Id. at 15.  The following
day, Janelle went to work with her hair up and without wearing
makeup, hoping that one of her colleagues would notice the
bruising.  Id.  When no one did, Janelle sought out HPD Officer
Dan Conley, who took photographs of Janelle's bruising on a
department camera.  Id. at 15, 21, 33; doc. no. 33-8 at 5.
Janelle stated that she was going to send the photographs to her
attorney.  Doc. no. 33-8 at 5.  Though she secretly hoped that
Conley would disclose this interaction to a superior officer,
Janelle asked that Conley keep it a secret because she believed
doing so would provide an excuse if it ever got back to Ben that
she had spoken with Conley.  Doc. no. 33-7 at 21, 34; doc. no.
33-8 at 6.  Conley agreed not to mention it to anyone so long as
Janelle told her attorney about the incident.  Doc. no. 33-8 at
5.

After Janelle left his office, Conley started to worry that
something bad might happen to Janelle and how he "would have
that on [him]" if he did not tell anyone.  Id.  Conley therefore
told Avery about his interaction with Janelle and about the

photographs he had taken.  Id. at 5-6.  Avery responded,
"[W]e're dealing with stuff with Janelle, she's got some
personal issues we're working through," and thanked Conley for
the information.  Id. at 6.  Avery did not ask to see the
photographs or prepare a report for the file regarding what
Conley had said.  Id.; doc. no. 33-4 at 5.  Neither Avery nor
Conley informed anyone else at the HPD about Conley's
conversation with Sargent.  Id. at 6.

## B.   June 2012 Incident

Shortly before 1:00 A.M. on June 30, 2012, Janelle called
HPD dispatch and reported that Ben had scratched her neck with a
key.  Doc. no. 33-5 at 16; doc. no. 33-7 at 14; 33-6 at 1; 33-19
at 1.  Lieutenant Charles Dyac and Officer Scott MacDonald
responded to the call.  Doc. no. 33-5 at 2; 33-19 at 3.  Dyac
was the first to arrive at the Sargents' residence, followed by
MacDonald two-to-three minutes later.  Id. at 2.

There is no dispute that that Dyac spoke with both Janelle
and Ben while at the scene.  See, e.g., id. at 2, 4; doc. no.
33-19 at 3.  Each provided Dyac with a significantly different
version of the events leading up to Janelle's call.  Dyac
memorialized these different versions, along with his own
observations, in both a police report and a subsequent e-mail to
several of his HPD supervisors.  Doc. no. 33-10; doc. no. 33-19;

doc. no. 33-6.  Janelle disputes both Ben's version of events
and several portions of Dyac's report and e-mail.

### 1.  Dyac's Report and E-mail

According to Dyac's police report, when he arrived at the
scene, Janelle was "highly intoxicated and unsteady on her
feet."  Doc. no. 33-19 at 3.  Janelle stated that she and Ben
had been at the Backstreet Bar and Grill ("Backstreet"), where
she had been "making out" with another woman.  Id.  She stated
that Ben became jealous, and that Ben scratched her on the side
of her neck with a key when they left the bar.  Id.  Janelle
stated that when she returned home, she tried to photograph the
scratch for a future divorce proceeding, but that Ben disabled
the camera.  Id.  Janelle stated that she then called the
police.  Id.

Once MacDonald arrived, Dyac went inside to speak with Ben.
Id.  Ben told Dyac that Janelle had been kissing another woman
at Backstreet, that Janelle and the woman had entered the
women's bathroom together for long periods of time, and that
when they exited the bathroom, both women bragged about having
sexual contact with each other.  Id.  Ben noted that he did not
approve of this behavior and eventually told Janelle that he
wanted to leave, but Janelle initially refused.  Id.  Ben
reported that when he and Janelle finally did leave, Janelle

said that she was "going to call them," which Ben interpreted to mean the HPD. Id. Ben stated that he was confused by this, as there had been no physical altercation. Id.

According to Dyac, Ben maintained that he did not assault Janelle. Id. at 4. Rather, Ben believed that Janelle received the scratch from the woman she had been kissing, as Janelle and the woman were "groping each other's face[s] . . . ." Id. at 4. Ben told Dyac that Janelle was taking several different medications, pain relievers, and antidepressants, and had been drinking heavily. Id. at 3. Ben stated that he had started hiding certain medications from Janelle when she was intoxicated, so as to avoid an accidental overdose. Id. Dyac reported that Ben tried to find a medication bottle he had hidden in his drawer, but discovered that it was missing; Ben surmised that Janelle had found the bottle. Id. at 3-4.

After speaking with Ben, Dyac concluded there was "insufficient evidence to establish probable cause that an assault had occurred . . . ." Id. at 4. At his deposition, Dyac testified that he reached this conclusion because Ben's version of events made more sense to him than did Janelle's. Doc. no. 17-5 at 3, 5-6. Additionally, Dyac reported that MacDonald later informed him that Janelle had recanted her statement. Doc. no. 33-19 at 4; doc. no. 33-5 at 19–20. The

officers accordingly left without making an arrest.  Doc. no. 33-19 at 4.

Dyac testified that following the incident, he concluded that he alone should write a report, given "the sensitive nature of this whole thing . . . ."  Doc. no. 33-5 at 4.  Upon returning to the HPD, Dyac checked to see whether there were any reports of other incidents involving Janelle and Ben, but did not discover any.  Id. at 14-15.

Dyac filed his report at 3:34 A.M. on June 30, 2012.  Doc. no. 33-19 at 1.  There are two versions of this report in the record, which differ in three respects.  First, the reports contain different dates in the upper-right-hand corner.  Compare doc. no. 33-10 at 1 with doc. no. 33-19 at 1.  At his deposition, Dyac explained that these were the dates the reports were printed.  Doc. no. 33-5 at 21.  Second, one version of the report states that the incident involved "domestic violence," while the other does not.  Compare doc. no. 33-10 at 1 with doc. no. 33-19 at 1.  Dyac testified that he initially forgot to check off the "domestic violence" box when writing his report, and that Avery sent it back to him to make the adjustment.  Doc. no. 33-5 at 21.  Finally, one version of the report includes a section listing Ben as a suspect, which is absent from the other version.  Compare doc. no. 33-10 at 1 with doc. no. 33-19 at 1.

Dyac testified that he "d[idn't] have an explanation" for this difference, but theorized that it was due to a software update between when each version of the report was printed. Doc. no. 33-5 at 22. The reports are otherwise identical: both list the offense as "simple assault"; both contain a status of "Incident Unfounded"; both include the same factual narrative; and both conclude by noting that "[t]his is the first domestic related incident reported to the [HPD]." Doc. no. 33-10 at 1, 3; doc. no. 33-19 at 1, 4.

After filing his report, Dyac sent an e-mail to several of his superiors at the HPD, including Avery and HPD Chief Jason Lavoie. See doc. no. 33-6 at 1. This e-mail contained the subject line "Janelle Sargent *SENSITIVE INFORMATION*" and included a narrative that, for the most part, hews closely to the narrative included in the report. Compare id. with doc. nos. 33-10 and 33-19. There is, however, an added section at the end of this e-mail, in which Dyac reported that Ben alleged Janelle had previously accused Ben of threatening her with a gun while she was intoxicated. Doc. no. 33-6 at 1. According to the e-mail, Ben stated that Janelle thought she had an "in" with the HPD because she was an HPD employee. Id. at 2. Dyac testified at his deposition that he did not include any of this information in his report because he did not feel it was

relevant to the incident and there was no evidence to conclude
that Ben had actually threatened Janelle with a gun.  Id. at 24–
25.

2.  Janelle's Disputes

At her deposition, Janelle took issue with several aspects
of Dyac's report.  First, while conceding that she kissed a
woman in front of Ben at the Backstreet (a decision she
attributed to having "had a couple of drinks"), Janelle
testified that she did not "make out" or go into the bathroom
with the woman.  Doc. no. 33-7 at 35, 36, 38.  Next, Janelle
testified that Ben scratched her neck with the key after they
had returned home, not when they left the bar as stated in the
report.  Id. at 36.  Janelle also disputed the assertion that
she recanted, testifying that after reading the report, she
called MacDonald, who denied saying that she had recanted and
stated he had never seen Dyac's report.  Id. at 50–51.  Janelle
also took issue with the statements in the report regarding Ben
hiding medications from Janelle.  Id. at 51.

Janelle and Dyac's deposition testimony also differs as to
whether Dyac or MacDonald was required to conduct a lethality
assessment protocol ("LAP") screen, take photographs of
Janelle's injuries, and/or provide Janelle with a so-called

"blue card" for victims of domestic violence.[3]  According to

Janelle, each of these actions was necessary because she

reported that Ben has assaulted her and she had a "visible mark

on [her] neck."  Id. at 41; doc. no. 33-3 ¶¶ 12, 13.  Dyac

testified that a LAP screen was unnecessary because, in his

view, Janelle's injuries were either self-induced or the result

of aggressively kissing the woman at the bar.  Doc. no. 33-5 at

3-4.  Dyac further testified that he declined to take

photographs of Janelle's neck, despite her asking that he do so,

because Janelle stated she wanted to use the photographs in her

divorce proceedings, which Dyac did not believe was "the police

department's business . . . ."  Id. at 6-7; 13-14.  Finally,

Dyac testified that he did not give Janelle a "blue card"

because he did not believe a crime had been committed.  Id. at

16.

**C.  <u>Aftermath</u>**

On the Monday following the June 30, 2012 incident, Avery

called Janelle to his office, where he reprimanded her for

drinking in Hudson on the night of the incident.  Doc. no. 33-4

at 4; doc. no. 33-3 ¶¶ 6, 7, 9; doc. no. 33-7 at 18.  Avery

---

[3] The "blue card" is a card that officers provide victims of
domestic violence, informing them of the process for getting a
protective order and providing contact information for various
reporting lines, victim/witness assistance programs, and victim
compensation programs.  See doc. no. 33-28.

noted that he had heard about the incident from Dyac, and told Janelle that "the chief is pretty pissed, and [Janelle] could see paperwork."  Doc. no. 33-7 at 18; doc no. 33-3 ¶ 9.  Avery had his feet up on his desk during this conversation, and did not ask Janelle about the incident or her safety.  Doc. no. 33-3 ¶¶ 10-11; doc. no. 33-4 at 4.  Following this interaction, Janelle feared that she might lose her job if she reported any other incidents of domestic violence to the HPD.  Doc. no. 33-7 at 22.

The HPD did not conduct any additional follow-up with Janelle regarding the incident.  Doc. no. 33-3 ¶ 15.  Dyac testified that it was typically the Town's victim witness advocate, not an HPD officer, who conducted such follow up. Doc. no. 33-5 at 17.  But here, the victim witness advocate was not made aware of Dyac's report and could not access it on the HPD computer system.[4]  Doc. no. 33-11 ¶¶ 14–15.

After the June 30, 2012 incident, Janelle's relationship with Ben got "much worse."  Doc. no. 33-7 at 14.  Janelle testified that Ben "knew even if he left a mark on [her] and

_____

[4] Janelle speculates that HPD officers kept the victim witness advocate from viewing the report by deliberately failing to label it "domestic violence."  Doc. no. 33-7 at 43. Defendants contend that it was HPD policy to "shield[] fellow employees from personal data concerning their co-workers."  Doc. no. 37 at 2 n. 2.

[she] called the police that nothing [would happen]." Id. at 15. Ben made alarming comments to Janelle and physically and sexually assaulted her. Doc. no. 33-3 ¶¶ 16-17. Janelle reported the sexual assault to county authorities because she did not trust the HPD to protect her. Id. ¶ 18. Janelle and Ben divorced in November 2012. Id. ¶ 3; doc. no. 33-7 at 23-24.

At some point following the June 30, 2012 incident, Janelle was diagnosed with posttraumatic stress disorder ("PTSD") and obsessive-compulsive personality disorder. Doc. no. 33-7 ¶ 20; doc. no. 33-14. This required that Janelle take a leave of absence from the HPD. Doc. no. 33-3 ¶ 20. When she was ready to return, she requested that she not be assigned to dispatch out of fear that Ben might call while she was on duty.[5] Id. ¶ 21; doc. no. 33-15 at 1. Janelle provided a doctor's note stating that the suggestion of returning to dispatch had caused a spike in Janelle's PTSD symptoms and that any contact with Ben could cause Janelle to relapse. Doc. no. 33-15 at 2. She was nonetheless assigned to dispatch, at times overlapping with Ben's shifts with the LPD.[6] Doc. no. 33-16 at 2. Janelle

---

[5] Though the LPD uses the Hillsborough County dispatch, LPD calls could be routed through HPD dispatch by Hillsborough County or Ben could call HPD dispatch directly. Doc. no. 33-12 at 13-14.

[6] The HPD sought to accommodate Janelle by ensuring that there was always someone else in dispatch during her shifts who

remained in dispatch for two months, during which time she fielded numerous calls from the LPD, though never from Ben. Id. at 26–27. During this period, her PTSD worsened, manifesting in physical and emotional symptoms. Id. at 28, 31–32.

In August 2013, the Town had Psychotherapy Associates, Inc. conduct a psychological fitness evaluation of Janelle. Id. at 48; doc. no. 33-17 at 1. In a report issued September 4, 2013, Janelle was deemed "**NOT FIT** for duty as a Dispatcher and . . . psychologically incapable of performing the tasks outlined in her description." Doc. no. 33-17 at 4 (emphasis in original); see also doc. no. 33-7 at 48. She was placed on paid administrative leave and received short-term, and then long-term, disability. Doc. no. 33-7 at 49.

In 2014, Janelle suffered a complete mental and emotional breakdown, requiring hospitalization. Doc. no. 33-3 ¶ 25. She is now disabled due to severe PTSD and receives social security disability income benefits. Doc. no. 33-7 at 2. She continues to receive regular mental health treatment and is prescribed several medications. Id. at 3–7.

---

could screen calls from the LPD or Hillsborough County. Doc. no. 33-16 at 3; doc. no. 33-7 at 26. Janelle believed these accommodations were inadequate, as there were ample reasons why the other dispatcher on duty with her might not physically be in dispatch when such calls were received. Doc. no. 33-7 at 26–30.

### III.  **DISCUSSION**

Janelle brings a state-law claim against the Town, Lavoie, Avery, and Dyac under a gross negligence theory, and a federal claim against Lavoie, Avery, and Dyac under an equal-protection "class-of-one" theory ("class-of-one claim").  Defendants move for summary judgment on both claims.  The court turns first to the class-of-one claim.

### A.  **Class-of-one Claim**

Janelle's class-of-one claim is premised upon a theory that the individual defendants treated her differently than other victims of domestic violence because Ben was a police officer with the LPD.  See doc. no. 1-1 ¶ 49; doc. no. 33-1 at 1.  The individual defendants do not dispute that the incident involving Janelle and Ben was the only of the hundreds of domestic violence cases they responded to in which the alleged abuser was a police officer.  They nevertheless argue, among other things, that the class-of-one claim is barred by the doctrine of qualified immunity.  As noted above, when a movant raises qualified immunity, the non-movant bears the burden of demonstrating that qualified immunity does not apply.  See Mitchell, 790 F.3d at 77; cf. Lopera, 640 F.3d at 395-96; al-Kidd, 563 U.S. at 735.

To meet this burden, Janelle must show that the individual

defendants "violate[d] clearly established statutory or
constitutional rights of which a reasonable person would have
known." See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)
(quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). In
assessing whether qualified immunity applies, the court
considers two prongs: (1) "whether the facts alleged or shown by
the plaintiff make out a violation of a constitutional right";
and (2) "whether the right was 'clearly established' at the time
of the defendant's alleged violation." Fernandez-Salicrup v.
Figueroa-Sancha, 790 F.3d 312, 325 (1st Cir. 2015) (quoting Glik
v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011)). Though "it is
often beneficial" to consider the qualified immunity prongs in
order, it is no longer mandatory that courts do so. Pearson,
555 U.S. at 236. This is especially true in cases where "it is
plain that a constitutional right is not clearly established but
far from obvious whether in fact there is such a right." Id. at
237. Thus, courts may "exercise their sound discretion in
deciding which of the two prongs of the qualified immunity
analysis should be addressed first in light of the circumstances
of the particular case at hand." Id. at 236; see also
Fernandez-Salicrup, 790 F.3d at 326 (noting that a court "may
address these issues in any order").

Here, there is little benefit in analyzing Janelle's class-

of-one claim under both prongs.  Analyzing this claim under the
first prong would require the court to grapple with several
complicated legal and factual questions, not least of which
whether a class-of-one theory is even a vehicle by which a
plaintiff may challenge the allegedly discriminatory application
of police protection.  In contrast, Janelle's claim is
relatively easily resolved under the second prong: as discussed
below, Janelle has failed to demonstrate that the individual
defendants' conduct violated a clearly established
constitutional or statutory right.  The court limits its
analysis accordingly.

When applying the second prong of qualified immunity, a
court must consider:

> (a) whether the legal contours of the right in question
> were sufficiently clear that a reasonable officer would
> have understood that what he or she was doing violated the
> right, and (b) whether in the particular factual context of
> the case, a reasonable officer would have understood that
> his or her conduct violated the right.

Fernandez-Salicrup, 790 F.3d at 325-26 (brackets omitted)
(quoting Mlodzinski v. Lewis, 648 F.3d 24, 32-33 (1st Cir.
2011)).  Though this does not require a "case directly on
point, . . . existing precedent must have placed the statutory
or constitutional question beyond debate."  Mullenix, 136 S. Ct.
at 308 (quoting al-Kidd, 563 U.S. at 741).  Janelle therefore
must identify "controlling authority or a robust consensus of

cases of persuasive authority" demonstrating that the individual defendants reasonably should have known that their conduct was unlawful at the time it occurred. Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks omitted) (quoting al-Kidd, 563 U.S. at 741). Courts must not "define clearly established law at a high level of generality." Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 742). Rather, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established." Id. (internal quotation marks omitted) (quoting al-Kidd, 563 at 742).

As a general matter, it is clearly established that law enforcement may not "selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 n. 3 (1989) (citation omitted). To this end, the First Circuit has recognized that a victim of domestic violence may bring an equal-protection claim alleging "that law enforcement policies provide lesser protection to victims of domestic violence and [thereby] discriminate on the basis of gender." Soto v. Flores, 103 F.3d 1056, 1066 (1st Cir.

1997) (emphasis added).[7]  These decisions do not control here for two reasons.  First, the proposition that law enforcement may not apply its protection in a discriminatory manner operates at the "high level of generality" insufficient to define a clearly established right.  See al-Kidd, 563 U.S. at 742 (citations omitted) (noting that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help" in determining whether a right is clearly established).  More fundamentally, however, Janelle does not allege that the HPD had a policy of discriminating against domestic violence victims due to some improper class-based distinction, such as their gender.  She instead contends that she alone was treated differently than other domestic violence victims because Ben was a police officer.  Thus, Janelle cannot rely on these broad equal-protection principles to defeat qualified immunity.

Moving, then, from the general to the particular, Janelle has failed to demonstrate that the individual defendants' conduct here violated clearly established law.  At the hearing, Janelle's counsel conceded that he was unaware of any Supreme

_____

[7] The First Circuit recognized the viability of such claims more than twenty years ago, adopting a widely-accepted framework first established by the Tenth Circuit in the case Watson v. City of Kansas City, KS, 857 F.2d 690 (10th Cir. 1988).  See Soto, 103 F.3d at 1066.

Court of First Circuit precedent on point, and Janelle's papers only cite one out-of-jurisdiction decision that addresses whether a police officer's differential treatment of a domestic violence victim due to her abuser's relationship with law enforcement violates equal protection: Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000) ("Shipp I").[8]  Setting aside that a single case cannot, by definition, constitute a "robust consensus of <u>cases</u> of persuasive authority," <u>Shipp I</u> does not compel the conclusion that the individual defendants' conduct violated Janelle's equal protection rights.  Indeed, that decision only posits that the conduct at issue here <u>may</u> violate equal protection.  See <u>id.</u> at 916–17 ("If deputy Betty Shipp did foster ill-will against her daughter-in-law that ultimately influenced the level of protection Shipp received from the WPSO, Shipp <u>may</u> be able to establish an unequal police protection claim . . . ." (emphasis added)).  Simply put, <u>Shipp I</u> is insufficient, particularly in isolation, to clearly establish the right Janelle seeks to invoke.[9]

---

[8] Overruled in part on other grounds by McClendon v. City of Columbia, 305 F.3d 314, 328–29 (5th Cir. 2002).

[9] The Sixth Circuit recently decided a case that, on its face, appears similar to the case at bar. See Ryan v. City of Detroit, MI, __ F. App'x __, 2017 WL 2829521 (6th Cir. June 30, 2017).  To the extent that decision is not factually or legally distinguishable, but see id. at *5, 5 n. 3 (noting that on appeal, the right at issue was asserted on a class-based theory,

Janelle also points to RSA 173-B and the HPD domestic violence policy to demonstrate that a reasonable officer would have understood that the individual defendants' conduct toward her was unlawful.  This argument is a nonstarter, however, as the Supreme Court has made clear that in order to defeat qualified immunity, the clearly established right must be the federal right on which the claim for relief is based.  See Elder v. Holloway, 510 U.S. 510, 515 (1994) (citing Davis v. Scherer, 468 U.S. 183, 193-96, 196 n. 14 (1984)); see also Hill v. Selsky, 487 F. Supp. 2d 340, 343 (W.D.N.Y. 2007) (citations omitted) ("[T]he existence of qualified immunity does not depend on whether the right in question was clearly established under state law, but on whether the federal right giving rise to the claim was clearly established at the time of the alleged violation.").  Thus, neither state law nor law enforcement policy can be used to demonstrate a clearly established right; that determination must be based on federal law alone.

Finally, Janelle cites Cordi-Allen v. Conlon, 494 F.3d 245 (1st Cir. 2007), to argue that class-of-one equal-protection claims have been well established in this circuit since at least

_____

not a class-of-one theory), it cannot be used here to demonstrate a clearly established right because it was decided in 2017, years after the conduct at issue in this case occurred.

2007. This argument, which counters the defendants' contention in their motion that there is no clearly established right to challenge police conduct under a class-of-one theory, reflects a curious aspect of class-of-one jurisprudence. Whereas qualified immunity analysis typically focuses on whether the <u>underlying</u> right was clearly established during the relevant period, <u>see, e.g., Belsito Commc'ns, Inc. v. Decker, 845 F.3d 12, 24-27 (1st Cir. 2016)</u>, in the context of class-of-one claims, several courts have instead considered whether the right to challenge certain conduct under a class-of-one theory was clearly established at that time, <u>see, e.g., Shipp v. McMahon, 54 F. App'x 413, 2002 WL 31718085 at *2 (5th Cir. 2002)</u> ("<u>Shipp II</u>"); <u>Grant v. Laufenberg, No. 12-C-668, 2015 WL 1246065, at *9 (E.D. Wis. Mar. 18, 2015)</u>; <u>see also Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1210 (11th Cir. 2007)</u> ("Neither the state officials nor the local officials had 'fair warning' that their actions <u>might subject them to legal liability</u>." (emphasis added)).[10]  As

---

[10] This focus is perhaps unsurprising.  Class-of-one claims are a narrow subset of equal protection jurisprudence where the plaintiff "has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" <u>Engquist v. Or. Dep't of Agr., 553 U.S. 591, 601 (2008)</u>.  Put differently, class-of-one actions are the recognized method for challenging <u>individualized</u> differential treatment by the government — that is, treatment based on some specific attribute of the individual rather than that individual's membership in a class, particularly a suspect class.  It follows, then, that if there is no clearly

both parties frame their arguments in this manner, and other courts have employed this analysis, the court will address whether there is a clearly established right to bring a class-of-one claim challenging the individual defendants' conduct here.

There is a long line of Supreme Court and First Circuit precedent recognizing class-of-one equal-protection claims challenging certain types of governmental action. See, e.g., Bank Markazi v. Peterson, 136 S. Ct. 1310, 1327 n. 27 (2016); Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 144 (1st Cir. 2016); Snyder v. Gaudet, 756 F.3d 30, 34 (1st Cir. 2014). Moving beyond this "high level of generality," however, things become far less clear. Neither the Supreme Court nor the First Circuit has addressed whether a plaintiff has a right to challenge disparate treatment by law enforcement under a class-of-one equal-protection theory. And while three circuits have

_____

established right to bring a class-of-one action challenging a particular type of government conduct, then the violative nature of that particular conduct is, at least arguably, also not clearly established. Thus, while it may not be obvious in such cases whether an underlying right exists, there is at least some argument that the lack of a clearly established means of bringing a claim may indicate that the constitutional right itself was not clearly established. See Pearson, 555 U.S. at 237.

seemingly countenanced such claims, see Mata v. City of
Kingsville, TX, 275 F. App'x 412, 415 (5th Cir. 2008); Klimik v.
Kent Cty. Sheriff's Dep't, 91 F. App'x 396, 399 (6th Cir. 2004);
Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000),
at least two have not revisited the issue since the Supreme
Court's declaration in Engquist v. Oregon Department of
Agriculture that forms of state action "which by their nature
involve discretionary decisionmaking based on a vast array of
subjective, individualized assessments" are ill-suited for
class-of-one challenges, 553 U.S. at 603.

The two circuits that have considered Engquist's impact on
the right to bring a class-of-one claim against law enforcement
are split. On the one hand, the Seventh Circuit reaffirmed its
ruling in Hilton that such a right exists, concluding that
Engquist does not stand as a categorical bar to all class-of-one
claims against police officers. See Hanes v. Zurick, 578 F.3d
491, 495-96 (7th Cir. 2010). The Eighth Circuit reached the
opposite conclusion, holding that "a police officer's decisions
regarding whom to investigate and how to investigate are matters
that necessarily involve discretion" which "may not be attacked
in a class-of-one equal protection claim." Flowers v. City of
Minneapolis, Minn., 558 F.3d 794, 799-800 (8th Cir. 2009). For
its part, the First Circuit has noted agreement "with those

federal courts that have found [Engquist] applicable beyond [its facts]," citing the Eighth Circuit's decision in Flowers as an example. Caesars Mass. Mgmt. Co., LLC v. Crosby, 778 F.3d 327, 336 (1st Cir. 2015). But as noted, the First Circuit has been silent on the viability of class-of-one claims challenging police conduct.

In those cases that have allowed class-of-one challenges to disparate police protection, either pre- or post-Engquist, the standards applied have varied. In Hilton, the Seventh Circuit stated that such claims required proof of "vindictive action" where "the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant." 209 F.3d at 1008 (citations omitted). In Mata, the Fifth Circuit relied on Hilton to impose the same requirement. See 275 F. App'x at 415 (quoting Hilton 209 F.3d at 1008). Yet in Hanes, the Seventh Circuit called into question the standard it established in Hilton, noting that "some more recent cases have cast doubt on the animus requirement . . . ." 578 F.3d at 494. Finally, in Klimik, the Sixth Circuit appeared to impose alternative requirements that a plaintiff either "negative every conceivable basis which might support the government action" or "demonstrate that the challenged government action was motivated by animus or ill-

will." 91 F. App'x at 400 (citations and internal quotations omitted). Thus, even in the context of those cases that have recognized a class-of-one equal-protection right to challenge law enforcement actions, there remains some question as to what standard should apply.

Finally, the few cases that have addressed class-of-one claims alleging disparate police protection of a victim of domestic violence due to her abuser's relationship with law enforcement provide little additional guidance. The court can identify only three such decisions — all from the Fifth Circuit and all cited by the parties in their papers. See Mata, 275 F. App'x 412; Shipp II, 54 F. App'x 413; Shipp I, 234 F.3d 907. These decisions are of limited utility for two distinct reasons. First, the Fifth Circuit has wavered on whether there even is a class-of-one equal-protection right in the police context, with the earliest opinion suggesting that there might be, Shipp I, 234 F.3d at 916-17, a subsequent panel calling that conclusion into question, Shipp II, 54 F. App'x 413, 2002 WL 31718085 at *1, and a third panel seemingly ignoring the intervening decision and relying on the earlier decision to assume that such a right does, in fact, exist, Mata 275 F. App'x at 415. More fundamentally, however, none of these decisions post-dates Engquist and, as noted above, it does not appear that the Fifth

Circuit has reconsidered the viability of this right (to the extent it exists) in light of that decision. Thus, it is unclear, especially in the wake of <u>Engquist</u>, whether the Fifth Circuit recognizes a class-of-one equal-protection right in the police context at all, let alone the particular class-of-one theory presented here.

In sum, Janelle has failed to demonstrate that the individual defendants' conduct violated a clearly established right under the Equal Protection Clause. The court cannot fairly conclude, for all of the reasons stated above, that the legal contours of the right in question were sufficiently clear in 2011 and 2012 (the period when the incidents in this case occurred) such that a reasonable officer would have known that his or her conduct violated that right. This is especially true when considering the particular factual context of this case, as Janelle has failed to identify any binding precedent or a robust consensus of persuasive authority addressing the alleged right beyond a high level of generality. The court therefore concludes that the individual defendants are entitled to qualified immunity on Janelle's class-of-one claim.

Accordingly, defendants' motion for summary judgment is **<u>granted</u>** as to Count II, the class-of-one claim.

**B.    State-law Claim**

In her state-law claim, Janelle alleges gross negligence on the part of all four defendants.  She seeks to bring this claim under RSA 173-B:12.  Defendants argue that RSA 173-B:12 does not confer a private right of action for gross negligence against a municipality or its officers, and that they are accordingly entitled to municipal immunity under RSA 507-B:5.  Janelle objects to defendants' argument on its merits, but also requests that the court certify two questions to the New Hampshire Supreme Court ("NHSC").  Defendants oppose certification, arguing that this court may enter summary judgment on the state-law claim without the benefit of the NHSC's view.  At the hearing, defendants raised an alternative argument that if the court were to grant summary judgment on the federal claim, it should remand the state claim to the superior court, where Janelle's arguments may be addressed in the first instance.  Janelle opposes remand.

The sole basis for this court's jurisdiction over Janelle's state claim is supplemental jurisdiction under 28 U.S.C. § 1367.  But when, as here, all federal claims have been dismissed, "the balance of factors to be considered under the pendant jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will [usually] point toward declining to exercise

29

jurisdiction over the remaining state-law claims." Wilbur v. Curtis, __ F.3d __, 2017 WL 4159603, at *6 (1st Cir. Sept. 20, 2017) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1999) and citing 28 U.S.C. § 1367(c)(3)).  The First Circuit has held that "it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve the interests of fairness, judicial economy, convenience, and comity."  Id. (citations and internal quotation marks omitted).  To this end, "it can be an abuse of discretion — if no federal claim remains — for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts."  Id. (citing Desjardins v. Willard, 77 F.3d 43, 45–46 (1st Cir. 2015)).

     In the court's view, at least one of the questions Janelle wishes to have certified to the NHSC presents an issue of New Hampshire law better left to the state court in the first instance.  Janelle asks whether "[i]t is unconstitutional pursuant to the equal protection provision of Part I, Article 14 of the New Hampshire Constitution for [RSA] 507-B to bar the plaintiff's gross negligence claim when the plaintiff could bring an identical claim against the State pursuant to RSA 541-

B:1, II-a(a)[.]"  Doc. no. 24 at 1.  In Huckins v. McSweeney, 166 N.H. 176 (2014), the NHSC declined to resolve whether "different treatment of individuals injured by municipal employee negligence and those injured by State employee negligence" violated the New Hampshire Constitution, noting that the plaintiff in that case had "alleged no negligence claim." Id. at 182.  As this issue has not been resolved,[11] and the question presented by Janelle here appears to be closely related, the court concludes that the state court is the appropriate forum for the state claim to be decided in the first instance.

Accordingly, the court declines supplemental jurisdiction over the state claim and **remands** this case to the Hillsborough County Superior Court South.

## IV.  CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (doc. no. 17) is **granted** as to Count II, the class-of-one claim.  The court declines supplemental jurisdiction over

---

[11] Though subsequent decisions have touched on related topics, see, e.g., McCarthy v. Manchester Police Dep't, 168 N.H. 202, 211 (2015) (holding that defamation actions are barred under both municipal and sovereign immunity because libel and slander fall within the definition of "intentional torts"), the NHSC has not yet addressed the issue left open in Huckins.

Count I, the state-law claim, and **remands** the case to Hillsborough County Superior Court South.  Janelle's motion to certify two questions to the NHSC (doc. no. 24) is accordingly **denied**.  Defendants' motion to strike (doc. no. 38) is **denied as moot**.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Andrea K. Johnstone
United States Magistrate Judge


September 27, 2017

cc:  Charles G. Douglas, III, Esq.
     Megan E. Douglass, Esq.
     John A. Curran, Esq.